UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,    15-CR-142-EAW-MJR
                             REPORT AND RECOMMENDATION
    -v-

GREGORY WILLSON,

             Defendant.
_____

Defendant Gregory Willson was indicted on drug trafficking, firearm, and Hobbs Act conspiracy and robbery charges on July 29, 2015. (Dkt. No. 1). The Hon. Elizabeth A. Wolford thereafter referred the case to the Hon. Hugh B. Scott for supervision of pretrial proceedings. On November 23, 2015 and January 13, 2016, the defendant moved to suppress: (1) statements he made to Erie County Sheriff's Office Detectives Jack Graham and Daniel Granville on October 1, 2013; (2) all physical evidence, including a firearm, ammunition, marijuana, and Kingsmen Motorcycle Club ("KMC") related documents and regalia, seized pursuant to a federal search warrant executed at the defendant's mother's house, 2936 Five Mile Road, Lot 4, Allegany, New York (the "Subject Premises"), on July 31, 2015; and (3) statements he made to Department of Homeland Security Special Agent/FBI Task Force Officer ("TFO") Gregory Mango and FBI Special Agent Steve Donnelly on July 31, 2015. (*See* Dkt. Nos. 19, 25). On March 2, 2016, Judge Scott held an evidentiary hearing at which FBI Special Agents Robert Kosakowski and Jason Galle testified and Government Exhibits 1-5 were received into evidence. (*See* Dkt. No. 32).

On March 16, 2016, the defendant was charged in a Second Superseding Indictment with RICO conspiracy, various firearm and drug trafficking counts, Hobbs Act

conspiracy and robbery, assault, and attempted murder. (Dkt. No. 33). After the Second Superseding Indictment was unsealed on March 22, 2016, Judge Wolford referred the case to the undersigned for supervision of pretrial proceedings. (Dkt. No. 35). A transcript of the March 2, 2016 evidentiary hearing before Judge Scott was provided to this Court for its review.[1] On July 11, 2016, the evidentiary hearing continued before this Court with the testimony of Detective Graham and TFO Mango. Government Exhibits 1, 2, 6, 8, 9, 10, and 12 were received into evidence.[2] On August 8, 2016, the government rested and the defense called one witness, Larry M. Johnston, before resting. Government Exhibit 13 was received into evidence that day.

After considering the evidence adduced at the hearing, the submissions of the parties, and argument from counsel, it is recommended that the defendant's motion to suppress be denied in its entirety.

## FINDINGS OF FACT AND LEGAL ANALYSIS

I. *October 1, 2013 Statements to Erie County Sheriff's Office Detectives Jack Graham and Daniel Granville*

   A. *Introduction*

The defendant has moved to suppress his statements to law enforcement on October 1, 2013. The defendant claims that although he was in custody that day, he was never given his *Miranda* warnings, and that when he invoked his right to counsel, law enforcement ignored his request and continued to question him. The Court finds that the defendant was given his *Miranda* warnings, that he did not unequivocally invoke

---

[1] Transcripts of the March 2, 2016 (Dkt. No. 128), July 11, 2016 (Dkt. No. 305), and August 8, 2016 (Dkt. No. 276) proceedings are designated as T1, T2, and T3, respectively.
[2] Government Exhibits moved into evidence before the undersigned are designated as "Govt. Ex." followed by the exhibit number and initials "MJR." Government Exhibits moved into evidence before Judge Scott on March 2, 2016 are designated in the same manner with the initials "HBS."

his right to counsel before speaking to law enforcement, and that he waived his *Miranda* rights. Accordingly, this branch of the defendant's motion to suppress should be denied.

### B. *Facts Established During the Hearing*

On October 1, 2013, Detective Graham and his supervisor, Senior Detective Alan Rozansky, drove to a union hall at 3651 California Road in Orchard Park, New York to locate and arrest the defendant on state firearm and drug charges emanating from a search of 57 Humphrey Road, Buffalo, New York on August 9, 2013. (*See* T2: 6-9; Govt. Ex. 6-MJR). Upon observing the defendant's vehicle pull into the parking lot, the detectives approached the defendant, identified themselves, advised him that he was under arrest, asked him to turn off his vehicle, handcuffed him behind his back when he exited the vehicle, and conducted a pat down. (T2: 10-11). Detective Graham recovered a spring-loaded knife in the defendant's front pants pocket during the pat down. (T2: 11). The defendant was then placed in the back seat of the detectives' patrol vehicle, where he was joined by Detective Graham. (T2: 12). Senior Detective Rozansky then drove them to the Erie County Sheriff's Office Narcotics and Intelligence Bureau at 45 Elm Street in downtown Buffalo. (T2: 13).

During the ride, Detective Graham advised the defendant that he was investigating the 57 Humphrey Road incident and a June 7, 2013 incident in Springville, New York. (T2: 15-16). Prior to asking the defendant any questions about either incident, Detective Graham read him his *Miranda* rights from a pre-printed *Miranda* warning card. (T2: 14-15, 18-19, 81-82; Govt. Ex. 1-MJR). Specifically, Detective Graham advised the defendant:

- You do have the right to remain silent and refuse to answer any questions.

- Anything you do say may be used against you in a court of law.

- As we discuss this matter, you have a right to stop answering my questions at any time that you desire.

- You have a right to a lawyer before speaking to me, to remain silent until you can talk to him, and to have him present when you are being questioned.

- If you desire a lawyer but you cannot afford one, one will be provided to you without cost.

- Do you understand each of these rights I've explained to you?

(T2: 20). As Detective Graham read each right to the defendant, he contemporaneously made a check mark on the *Miranda* warning card next to each right indicating that he had read it to the defendant. (T2: 21-22; Govt. Ex. 1-MJR).

Once he was properly advised of his *Miranda* rights and asked whether he understood each of them, the defendant responded in the affirmative, indicating that he understood his rights. (T2: 20-21). Detective Graham next asked the defendant "now that I have advised you of your rights, are you willing to answer my questions?" (T2: 21; Govt. Ex. 1-MJR). The defendant stated, "Maybe I should get a lawyer. Let's see what you got to say," a response which Detective Graham contemporaneously documented on the top of the *Miranda* card. (T2: 21; Govt. Ex. 1-MJR).

Based upon the defendant's response, "Maybe I should get a lawyer. Let's see what you got to say," Detective Graham also wrote "invoked" in the space provided at the bottom of the card for the defendant's initials. (T2: 21-22; Govt. Ex. 1-MJR). After noting the defendant's response to the *Miranda* warnings verbatim, the date and time,

and the word "invoked," Detective Graham told the defendant that he could not speak with him. (T2: 21-23). The defendant then became adamant about wanting to speak with Detective Graham, so Detective Graham called Erie County Assistant District Attorney ("ADA") John Feroleto for legal advice on how to proceed. (T2: 23; Govt. Ex. 6-MJR at 4-5).[3]

After Detective Graham relayed the above facts and circumstances to ADA Feroleto, ADA Feroleto advised him that the defendant's invocation of his right to counsel had to be unequivocal. (T2: 23). Thus, because the defendant's statement, "Maybe I should get a lawyer. Let's see what you got to say," is patently equivocal, ADA Feroleto advised Detective Graham to go ahead and talk to the defendant. (T2: 23, 59).[4] As Detective Graham explained, he called ADA Feroleto because he "wanted to make sure that [he] was on firm ground, and that any admissions that the defendant might make would be inbounds (*i.e.*, legal)." (T2: 24). Detective Graham's impression of the defendant, based upon his twenty-nine plus years of law enforcement experience, was that the defendant's statement, "Maybe I should get a lawyer. Let's see what you got to say," was designed to "hedge his bets" — that is, the defendant wanted to speak with the detectives in order to gain insight into the case against him while rendering any of his statements inadmissible. (T2: 4-5, 24).

Detective Graham did not question the defendant during the transport to the Erie County Sheriff's Office. Once they arrived there, the defendant was placed in a booking room and had his handcuffs removed. (T2: 25-26, 82). Senior Detective Rozansky

---

[3] ADA Feroleto was the felony prosecutor working with Detective Graham to investigate the Springville and 57 Humphrey Road incidents. (T2: 23, 25).

[4] In his police report memorializing the events of the day, Detective Graham detailed the fact that, after being told they could not talk, "Willson then told us he did, in fact, want to speak to us." Detective Graham further documented ADA Feroleto's advice that the defendant must unequivocally invoke his right to counsel and that the defendant did not do so. (T2: 82-83; Govt. Ex. 6-MJR at 4).

departed and Detective Graham was joined by Detective Granville to interview the defendant. (T2: 26). While seated at a bench in the booking room, the defendant was given water and briefly interviewed about the Springville and 57 Humphrey Road incidents. (T2: 27; Govt. Ex. 6-MJR at 4-5). Although the defendant responded verbally, his answers appeared guarded. (T2: 27-28). Detective Graham took notes and typed up a CPL 710.30[5] notice form memorializing the defendant's oral statements. (T2: 28-30; Govt. Ex. 2-MJR). The first paragraph of the notice sets forth the defendant's statements regarding the Springville incident, while the second paragraph documents the defendant's statements regarding the search of 57 Humphrey Road. (T2: 30-33; Govt. Ex. 2-MJR). When the detectives asked the defendant who owned the revolver and cocaine found at 57 Humphrey Road, the defendant declined to answer. (T2: 33; Govt. Ex. 2-MJR). The defendant likewise declined to provide a DNA sample. (T2: 33; Govt. Ex. 2-MJR). When Detective Graham asked the defendant if he would provide a formal written statement, the defendant declined, indicating that he was concerned about mentioning the names of other KMC members. (T2: 33-34, 77-78). The interview concluded and the defendant was transported to the Erie County Holding Center and processed on state criminal charges. (T2: 34; Govt. Ex. 6-MJR).

The Court found Detective Graham to be a wholly credible witness.

C. *Legal Analysis*

1. *The Defendant Was Properly Advised of His* Miranda *Warnings*

When an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and subject to questioning, "[h]e must be warned

---

[5] New York Criminal Procedure Law ("CPL") §710.30 requires New York state prosecutors to provide notice of a defendant's statements to a public servant within fifteen days after arraignment and before trial. This notice is commonly referred to as a "710.30 Notice." (T2: 28-29).

prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The individual must be afforded the opportunity to exercise these rights throughout the interrogation. *Id.* at 479. "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.* A verbatim recitation of the language of the *Miranda* opinion is not required so long as the warnings given "fully conveyed to [the individual] his rights as required by *Miranda*." *California v. Prysock*, 453 U.S. 355, 359-61 (1981).

Here, the credible evidence establishes that Detective Graham properly advised the defendant of his *Miranda* rights by reading from a pre-printed *Miranda* card. (T2: 18; Govt. Ex. 1-MJR). Detective Graham contemporaneously checked off each right on the card as he read it to the defendant, and the defendant indicated that he understood his rights. (T2: 20-22; Govt. Ex. 1-MJR). Thus, the Court finds as a matter of fact that the defendant was given his *Miranda* warnings prior to any questioning.

        2. *<u>The Defendant Did Not Invoke and Waived His Right to Counsel</u>*

A valid *Miranda* waiver may in some instances be inferred from "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). An "express written or oral statement of waiver of the right to remain silent or of the right to counsel" is not required. *Id.* Further, "[w]here the prosecution shows that a *Miranda* warning was given and that it

was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *see also United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (finding defendant who nodded his head and answered "yes" when asked if he understood his rights prior to his confession had waived his *Miranda* rights).

In *Edwards v. Arizona*, 451 U.S. 477, 485 (1981), the Supreme Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. However, in *Davis v. United States*, 512 U.S. 452, 459 (1994), the Supreme Court declined to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. The Supreme Court in *Davis* further stated that "[i]n considering how a suspect must invoke the right to counsel, we must consider the other side of the *Miranda* equation: the need for effective law enforcement." *Id.* at 461. Regarding that need, the Supreme Court continued:

> Although the courts ensure compliance with the *Miranda* requirements through the exclusionary rule, it is police officers who must actually decide whether or not they can question a suspect. The *Edwards* rule — questioning must cease if the suspect asks for a lawyer — provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.

*Id.* Finally, in affirming the lower court's denial of suppression, the Supreme Court in *Davis* saw no reason to disturb the conclusion that the petitioner's remark — "Maybe I should talk to a lawyer" — was not a request for counsel. *Id.* at 462.

Here, as in *Davis*, the defendant's statement, "Maybe I should get a lawyer. Let's see what you got to say," was not a clear request for counsel. The first portion of the defendant's statement, "Maybe I should get a lawyer," is just as ambiguous as the petitioner's remark in *Davis*. The second portion of the defendant's statement, "Let's see what you got to say," is an explicit and clear indication that the defendant wanted to speak with Detective Graham. Based upon Detective Graham's experience and the defendant's ambiguous statement, he properly interpreted the defendant's conduct as an attempt to hedge his bets — that is, the defendant wished to speak with the detectives while attempting to ensure that any statements he made would be suppressed.[6] The Supreme Court in *Davis* made clear that law enforcement need not engage in guesswork to determine whether a defendant really wants a lawyer. Thus, the defendant did not invoke his right to counsel here.

Moreover, after Detective Graham told the defendant that the two could not talk, the defendant became adamant about wanting to speak. (T2: 23; Govt. Ex. 6-MJR at 4-5). In an abundance of caution, Detective Graham called ADA Feroleto for a legal

---

[6] The following statements have also been held insufficient to constitute an unambiguous request for counsel:
- The suspect's statement that he had a lawyer in another case. *United States v. Oehne*, 698 F.3d 119, 123 (2d Cir. 2012);
- The statement "I am not sure if I should be talking to you," and "I don't know if I need a lawyer" coupled with a refusal to sign a waiver form. *United States v. Plugh*, 648 F.3d 118, 125-27 (2d Cir. 2011); and
- The suspect's statement that he was "going to get a lawyer" without actually requesting one. *United States v. Scarpa*, 897 F.2d 63, 66, 70 (2d Cir. 1990). *But see Wood v. Ercole*, 644 F.3d 83, 91-92 (2d Cir. 2011) (finding suspect's statement, "I think I should get a lawyer," to be an unambiguous request for counsel).

opinion as to whether he could speak with the defendant because, as Detective Graham testified, he wanted to make sure the interview would be lawful. (T2: 24). However, as *Davis* establishes, because the defendant never invoked his right to counsel, Detective Graham would have been on firm legal ground in speaking with the defendant even if he never sought a legal opinion from ADA Feroleto.

Based upon the foregoing, the Court finds that the defendant was properly advised of his *Miranda* warnings, verbally indicated that he understood his rights, and, although he did not sign the *Miranda* form or any statements, his conduct in answering questions after indicating a desire to speak was an implied waiver of his right to counsel. Accordingly, it is recommended that the defendant's motion to suppress the statements he made on October 1, 2013 be denied in all respects.

    II.    *July 31, 2015 Search at 2936 Five Mile Road, Lot 4, Allegany, New York*
         A.  *Introduction*

The defendant moves to suppress evidence seized pursuant to the search warrant executed at 2936 Five Mile Road, Lot 4, Allegany, New York based upon the allegation that the search warrant was executed before 6:00 a.m., in violation of Fed. R. Crim. P. ("Rule") 41. An arrest warrant for the defendant was executed that same day, prior to the execution of the search warrant. The Court finds that: (1) even if the initial entry into the Subject Premises occurred before 6:00 a.m., it was for the purpose of executing the arrest warrant, not the search warrant, and the undisputed evidence shows that the search warrant was not executed until after 6:00 a.m.; and (2) even assuming *arguendo* that the search warrant was executed prior to 6:00 a.m., in violation of Rule 41, the motion to suppress should be denied as defendant has failed to allege or show any

prejudice as a result of the alleged violation or an intentional and deliberate disregard of Rule 41. Accordingly, the defendant's motion to suppress items seized pursuant to the search warrant should be denied.

### B. *Facts Established During the Hearing*

On July 31, 2015, the FBI executed both an arrest warrant and a search warrant pertaining to the defendant at his mother's house, 2936 Five Mile Road, Lot 4, Allegany, New York. (T2: 139). The FBI Swat team initially entered the Subject Premises for the purpose of executing the arrest warrant. (T1: 20-21). Just before entering, one of the SWAT team members saw the defendant in the window and began giving him commands. (T1: 19). The SWAT team then breached the door and entered the premises. (T1: 20). Special Agent Galle, who led the breach team, testified that the breach occurred at 6:05 a.m. (T1: 21, 27). After entering, the SWAT team arrested the defendant and did a protective sweep of the Subject Premises. (T1: 22-23). Once the house was secure, the SWAT team contacted the search team, which was waiting nearby to execute the search warrant. (T1: 9-10, 24). The search team arrived at approximately 6:15 a.m. to execute the search warrant. (T1: 24, 57, 60, 65; Govt. Ex. 3-HBS).

At the hearing, the defendant called as a witness Larry M. Johnston, a longtime neighbor of the defendant's mother who resides across the street. (T3: 22, 30-31). Mr. Johnston testified that he woke up at 5:00 a.m. that morning. (T3: 7). At approximately 5:20 a.m., he went outside to take his garbage out when he saw a man dressed in camouflage, a bullet-proof vest, and a helmet carrying an assault weapon. (T3: 9-10). Mr. Johnston made eye contact with the man, who then used hand gestures to instruct

z
q

him to be quiet, drop the garbage, and return to his home. (T3: 10-11). Mr. Johnston returned home and observed that his clock read 5:22 a.m. (T3: 12).

Mr. Johnston then went to a window where he could see the Subject Premises, as well as the man he saw outside earlier. (T3: 12-13). The man had "FBI" written on his back and had taken a shooting position in a group of trees. (T3: 13). Mr. Johnston also observed other law enforcement personnel at the back door of the Subject Premises. (T3: 14). He then heard a "big boom" coming from the front door of the Subject Premises, which made him jump away from the window. (T3: 16-17). He did not see anyone knock down the door, however. (T3: 17). Moments later, Mr. Johnston looked out the window and witnessed law enforcement officers entering the house. (T3: 16-17). Mr. Johnston estimated that the "boom" occurred "[w]ithin a couple minutes" of 5:20 a.m. (T3: 17). The Court presumes that the "boom" Mr. Johnston heard was the SWAT team breaching the front door.

The Court found the government's witnesses and Mr. Johnston to be credible, notwithstanding that their testimony appears to be inconsistent as to the exact time law enforcement entered the Subject Premises. For the reasons set forth below, the Court need not resolve this factual dispute as it does not affect its legal analysis.

    C. <u>Legal Analysis</u>

        1. <u>Law Enforcement Was Permitted to Execute the Arrest Warrant at Any Time Because It Had a Reasonable Belief that the Defendant Was Present at the Subject Premises</u>

The defendant argues that any evidence seized during the search of the Subject Premises must be suppressed because, based on the testimony of Mr. Johnston, the

search warrant was executed before 6:00 a.m., in violation of Rule 41(e)(2)(A)(ii). That Rule requires a search warrant to be executed during the "daytime, unless the judge for good cause expressly authorizes execution at another time[.]" "Daytime" is defined as "the hours between 6:00 a.m. and 10:00 p.m., according to local time." Rule 41(a)(2)(B). The Court finds the defendant's argument to be without merit, for even if law enforcement first entered the Subject Premises before 6:00 a.m., it did so to execute an arrest warrant, not a search warrant, and therefore the daytime requirement did not apply.

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *see also United States v. Lauter*, 57 F.3d 212, 214 (2d Cir. 1995) ("Agents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present."). On its face, Rule 41 applies to search and seizure warrants, not arrest warrants. Thus, the execution of an arrest warrant is not subject to the Rule's "daytime" or "after 6:00 a.m." requirement. *See United States v. Giwa*, 617 F. Supp. 2d 1086, 1096 n.4 (D. Nev. 2007) ("[Defendant] also complains that the nighttime execution of the arrest warrant violated Fed. R. Crim. P. 41(e), which requires that a warrant command the officer to execute the warrant during the daytime unless the issuing judge expressly authorizes execution at another time. The complaint is misplaced. Rule 41 deals with search warrants, not arrest warrants. It makes little sense to place such a limitation on the time of day when an arrest warrant may be executed.").

Here, the FBI had a valid arrest warrant for the defendant, had reason to believe that he lived at the Subject Premises with his mother, and even observed the defendant inside the Subject Premises immediately before entry. The FBI's entry into the Subject Premises was therefore lawful, regardless of the time of entry.

The evidence adduced at the hearing further shows that the FBI's search team did not enter the Subject Premises to execute the search warrant until approximately 6:15 a.m. The defendant offered no evidence, not even the testimony of Mr. Johnston, to contradict this fact. Thus, the search of the Subject Premises pursuant to the search warrant was in full compliance with Rule 41's "daytime" requirement.

        2. *<u>Even If Law Enforcement Made Entry Pursuant to the Search Warrant Before 6:00 a.m., the Defendant Has Failed to Show that Suppression is Required</u>*

Assuming *arguendo* that law enforcement violated Rule 41 by entering the Subject Premises before 6:00 a.m. in order to execute the search warrant, the defendant's motion to suppress should still be denied because he has neither alleged nor shown any prejudice resulting from the early entry or that law enforcement intentionally and deliberately disregarded the daytime requirement.

In *United States v. Burke*, 517 F.2d 377, 381 (2d Cir. 1975), the defendant moved to suppress evidence seized during a search on the basis that the search warrant failed to comply with former Rule 41(c). In affirming the district court's denial of the motion, the *Burke* Court held:

> [V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*Id.* at 386-87. Courts have since applied *Burke* to Rule 41's "daytime" requirement. In *United States v. Olsen*, No. 04 CR 646 SJF ALL, 2006 WL 270249 (E.D.N.Y. Jan. 25, 2006), the defendant moved to suppress evidence seized pursuant to a search warrant on the ground that the government conducted an unauthorized nighttime search. The *Olson* Court denied the motion, finding that "even if the search had occurred prior to 6:00 a.m., Defendant has failed to demonstrate prejudice as there is no indication that the search would not have occurred, or that Defendant would have been less 'shock[ed]' and 'disorient[ed]' by a later search," and because "Defendant has failed to demonstrate that an early entry was the result of an intentional and deliberate disregard for Rule 41(e)(2)(B)." *Id.* at *4 (alterations in original) (citing *Burke*, 517 F.2d at 386-87).

Similarly, in *United States v. Cardona*, No. 14-CR-314(RA), 2015 WL 769577, at *7 (S.D.N.Y. Feb. 24, 2015), the defendant claimed that law enforcement executed a search warrant on the defendant's home approximately fifteen to thirty minutes before 6:00 a.m. The district court assumed the veracity of the defendant's claim and, relying on the principles set forth in *Burke*, denied his motion to suppress without a hearing. The court held:

> [T]here is no suggestion in Defendant's moving papers that the search would have been less abrasive if executed at 6 a.m. because, for example, he would have been awake then and thus not subject to the same "great stress and diminished cognitive functioning." Furthermore, Defendant does not allege intentional and deliberate disregard by the agents. Thus, even accepting Defendant's claim that the agents entered his home between 15 and 30 minutes prior to the authorized time, exclusion is inappropriate in these circumstances.

*Id.* at *7-8.

Applying these principles to the defendant's motion, the motion should be denied because the defendant has not shown prejudice or intentional disregard with respect to the alleged nighttime search. In particular, the Court finds that: (1) the search still would have occurred pursuant to the search warrant; (2) the search would not have been any less abrasive at 6:00 a.m. than it was if it occurred earlier, as the defendant claims; (3) there is no evidence that the executing agents intentionally or deliberately disregarded the warrant execution time requirement; and (4) the agents also executed an arrest warrant, making entry inevitable.[7]

### III. *July 31, 2015 Post-Arrest Interview at FBI Headquarters*

#### A. *Introduction*

The defendant contends that his statements to law enforcement following his arrest on July 31, 2015 should be suppressed because he was pressured and threatened by law enforcement into making them. The defendant's contention is without merit.

---

[7] Given the Court's recommendation to deny suppression of the physical evidence resulting from the search of the Subject Premises, it need not address the government's arguments regarding inevitable discovery and the good faith exception.

B. *Facts Established During the Hearing*

On July 31, 2015, TFO Mango and SA Donnelly were assigned to transport the defendant to FBI Headquarters ("HQ") in Buffalo, New York following his arrest. (T2: 94). TFO Mango first came into contact with the defendant outside the Subject Premises at approximately 6:28 a.m., after he had been taken into custody by the FBI SWAT team. (T2: 94). The defendant was in handcuffs and escorted by a SWAT team member, who handed him over to TFO Mango for transport to FBI HQ. (T2: 95). TFO Mango estimated that it took approximately one hour and ten minutes to travel from the Subject Premises to FBI HQ. (T2: 95, 97). The defendant sat quietly in the back seat during the trip. (T2: 97). TFO Mango and SA Donnelly did not threaten him on the way to FBI HQ nor did they make him any promises. (T2: 97). The three arrived at FBI HQ at approximately 7:40 a.m. (T2: 98). The agents parked the vehicle, entered headquarters, and allowed the defendant to use the restroom. (T2: 98). Around 7:54 a.m., they entered an interview room and activated video and audio equipment. (T2: 98; Govt. Exs. 10 & 12-MJR). The agents gave the defendant his *Miranda* warnings at 7:59 a.m. (Govt. Exs. 10 & 12-MJR). The defendant verbally confirmed that he understood his rights, stated that he was willing to speak, and signed the *Miranda* warnings card at approximately 8:08 a.m. after briefly expressing some reservations about signing the document. (T2: 99-100, 134; Govt. Exs. 9, 10, & 12-MJR). The interview continued in a relaxed conversational tone (*see* T2: 104; Govt. Ex. 12-MJR), and the defendant declined to answer certain questions (T2: 101; Govt. Ex. 12-MJR). The interview concluded at approximately 9:48 a.m., after the defendant had a telephone call with his mother. (Govt. Exs. 10 & 12-MJR). The agents then transported the defendant to the

United States Courthouse where he was processed and booked by the United States Marshal Service at 10:00 a.m. (Govt. Ex. 10-MJR). At the hearing, the government submitted a video recording of the entire interview (Govt. Ex. 12-MJR), which the Court has reviewed in its entirety.

      C. *Legal Analysis*

The video recording documents the manner in which the agents advised the defendant of his *Miranda* warnings as well as the defendant's agreement to speak with the agents without a lawyer. (Govt. Exs. 9 & 12-MJR). Specifically, the defendant was advised of the following:

- You have the right to remain silent.

- Anything you say can be used against you in Court.

- You have the right to talk to a lawyer for advice before we ask you any questions.

- You have the right to have a lawyer with you during questioning.

- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

- If you decide to answer questions now without a lawyer present, you have the right to stop answering at anytime.

- I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

(Govt. Exs. 9 & 12-MJR). The defendant verbally agreed to speak with investigators and signed the *Miranda* waiver at 8:08 a.m. (*See* Govt. Exs. 9 & 12-MJR).

Where, as here, the government shows that they gave the defendant his *Miranda* warnings and that he understood the warnings, the defendant's uncoerced statement

establishes an implied waiver of the right to remain silent. *See Berghuis*, 560 U.S. at 384; *see also Tutino*, 883 F.2d at 1138 (finding defendant who nodded his head and answered "yes" when asked if he understood his rights prior to his confession had waived his *Miranda* rights). Contrary to defendant's argument, the video recording shows that he was not pressured, forced, threatened, coerced, or promised anything to sign the waiver and make statements. Accordingly, it is recommended that this branch of defendant's motion to suppress be denied.

## **CONCLUSION**

For the foregoing reasons, it is recommended that the defendant's motion to suppress (Dkt. Nos. 19, 25) be denied in its entirety.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Wolford.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED**.

Dated:   February 27, 2017
         Buffalo, New York

                                              */s/ Michael J. Roemer*
                                              MICHAEL J. ROEMER
                                              United States Magistrate Judge